# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| **RICK FUCHS and GRAHAM HECK,** | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | **CASE NO. 1:23-cv-1178** |
| **v.** | ) | |
| | ) | |
| **STEWARD PARTNERS GLOBAL** | ) | **ORIGINAL COMPLAINT FOR** |
| **ADVISORY, LLC and STEWARD** | ) | **VIOLATIONS OF SECTION 12 OF THE** |
| **PARTNERS MANAGEMENT** | ) | **SECURITIES ACT OF 1933** |
| **HOLDINGS, LLC** | ) | |
| | ) | **JURY TRIAL REQUESTED** |
| *Defendants.* | ) | |
| | ) | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiffs Rick Fuchs ("Fuchs") and Graham Heck ("Heck") (collectively "Plaintiffs"), by and through counsel of record, hereby file their Original Complaint against Steward Partners Global Advisory, LLC and Steward Partners Management, Holdings, LLC (together "Steward" or "Defendants"). Plaintiff's Original Complaint pleads federal securities claims brought pursuant to Section 12(2) of the Securities Act of 1933.[1] Accordingly, Plaintiffs allege as follows:

## I.
### INTRODUCTION

1.     Plaintiffs are part of a team of financial professionals who, among other things, served as registered investment advisors for approximately 50 high net-worth clients.

---

[1] Concurrent with the filing of this Complaint, Plaintiffs have also filed a FINRA arbitration proceeding against Steward Partners Global Advisory, LLC and its captive broker-dealer, Steward Partners Investment Solutions, LLC for claims arising out of Plaintiffs' employment with each.

2.     In October 2020, Plaintiffs and their team joined Defendant Steward Partners Global Advisory as wealth managers. Prior to that time each had been wealth managers at Wells Fargo Advisors, where they had provided the same services to their client base.

3.     Defendant first began recruiting Plaintiffs and their team in or around March 2019. In addition to their touting of Steward's ability to provide a platform through which Plaintiffs could maintain their practice, Steward also made certain financial promises to Plaintiffs. Relevant here, Steward offered several million dollars' worth of securities—*i.e.*, 7-year vesting LP units in Defendant Steward Partners Management Holdings—which would be sold to Plaintiffs and their team in exchange for their promise to join Steward.

4.     Steward relentlessly pursued Plaintiffs and their team throughout 2019 and 2020, continuing to represent to Plaintiffs that the LP units which were priced at $17.50 per unit were truly worth between $20 and $25 per unit. Steward's recruitment efforts culminated in the entire team joining Steward. Unfortunately, the representations Steward made to Plaintiffs—particularly with regard to the imputed value of the LP unit—were knowingly and materially false. As a result of Plaintiffs' reasonable reliance on Steward's material misrepresentations regarding the value of the securities, they have suffered significant damages.

5.     Accordingly, Plaintiffs seek to recover damages from Steward pursuant to Sections 12 of the Securities Act of 1933.

## II.
### PARTIES

6.     Plaintiff Fuchs is an individual and, at all times relevant hereto, resided within this district. Fuchs was formerly a wealth manager associated with Steward.

7.     Plaintiff Heck is an individual and, at all times relevant hereto, resided within this district. Heck was also formerly associated with Steward as a wealth manager.

8. At all relevant times, Plaintiffs were employed by Steward in Austin, Texas.

9. Defendant Steward Partners Global Advisory, LLC ("Steward Advisory") is a Registered Investment Advisor (RIA) with its principal place of business in Washington, DC, and at all relevant times operated in Austin, Texas out of its office at 807 Las Cimas Parkway, Austin, Texas 78746.

10. Defendant Steward Partners Management Holdings, LLC ("Steward Holdings") is a Delaware Limited Liability Company with its principal place of business in Washington, DC. At all relevant times, Defendant Steward Holdings was the issuer of the securities sold to Plaintiffs by Defendant Steward Advisory.

### III.
### JURISDICTION & VENUE

11. Claims asserted herein arise under and pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2).

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act, 15 U.S.C. § 77v.

13. Venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, because certain of the transactions, acts, practices, and courses of business occurred within this District.

### IV.
### FACTS

**A.   DEFENDANT STEWARD ADVISORY'S RECRUITMENT OF PLAINTIFFS AND THEIR TEAM**

14. Both Fuchs and Heck are wealth managers with decades of experience in the financial services industry.

15. Fuchs earned his Bachelor's Degree in Business Administration ("BBA") in accounting from Texas A&M University in 1987 and Certified Investment Management Analyst

("CIMA") designation from The Wharton School, The University of Pennsylvania in 2004. Thereafter, he worked in the Private Banking and Investment Group at Merrill Lynch for more than a decade and prior to that was a Senior Financial Advisor at Bernstein Investment Research and Management in Dallas, New York, and Los Angeles. Immediately before joining Steward Advisory, Fuchs was a member of Wells Fargo's High Net Worth group in Austin, Texas.

16.     Heck earned both his BBA and Master's Degree in Business Administration in finance from Texas State University. Thereafter, he worked as a member of Wells Fargo's High Net Worth team for more than a decade prior to joining Defendant Steward Advisory.

17.     In March 2019, while Plaintiffs were each employed by Wells Fargo in Austin, Texas, Defendant Steward Advisory began their targeted recruitment scheme of Plaintiffs and their team.

18.     Specifically, Fuchs and Heck were invited to attend a dinner recruitment meeting in March 2019 with Jim Gold (Steward Advisory's CEO), Hye Saporta (Steward Advisory's COO), and Chris Barton ("Barton") (Steward Advisory's Regional President).

19.     During this recruitment meeting, Gold, Saporta, and Barton pitched Fuchs and Heck on Steward Advisory's unique compensation structure, and in particular, the value in joining Steward Advisory through the receipt of securities in the form of limited partnership ("LP") units in Steward Holdings. The LP units would be subject to a 7-year vesting period, but not tied to any other conditions related to performance or production at Steward Advisory—such as asset growth or revenue hurdles.

20.     Over the course of the next year, Steward Advisory continued its recruitment of Plaintiffs, expressing interest in each and their team.

21.     Throughout Steward Advisory's recruitment of Plaintiffs, Barton—on behalf of Steward Advisory—continually made representations to Plaintiffs regarding the value of the LP units they would receive. Those representations regarding the value of the LP units were material to Plaintiffs' negotiations.

22.     Specifically, Steward Advisory, through Barton and others, represented both orally and in writing that, although the LP units were priced at $17.50 per unit, the units would be repriced shortly and that the actual value of the units would be far greater—such that the up-front price Steward Advisory would be paying to Plaintiffs in exchange for Plaintiffs joining Steward Advisory would be even greater.

23.     For example, in December 2019, Steward Advisory represented to Plaintiffs that the LP units were in fact worth $20 per unit, and not the $17.50 stated value. And throughout the "courting" period, Steward continued to misrepresent the actual value of the units.

24.     Then again, in February of 2020, Steward Advisory represented to Plaintiffs that the actual value of the LP units had increased again and were actually now worth $25.00 per unit. Both the December 2019 and February 2020 representations by Steward Advisory were material representations to Plaintiffs regarding the price of the securities and relied upon by them when setting a price for and deciding to transition their business from Wells Fargo to Steward Advisory.

25.     Moreover, the fact that the LP units were not tied to assets under management or revenue production was also a material term with regard to the securities and relied upon by Plaintiffs when considering the compensation and monetary transition assistance they would receive in exchange for the risks inherent in moving their client base to a different firm.

**B.**     **THE VALUE OF THE LP UNITS ARE VASTLY OVERSTATED**

26.     In September of 2020, Plaintiffs decided, based at least in part upon the representations described above, to transition their team from Wells Fargo to Steward.

27.     Thus, on October 1, 2020, relying upon Steward's representations as detailed above, Plaintiffs resigned from Wells Fargo and with their team joined Steward.[2]

28.     Thereafter, Plaintiffs were issued LP units at a value of $17.50 per unit, with Fuchs receiving 118,609 units and Heck receiving 31,416 units. The units themselves were certificated through a Subscription Agreement for the securities.[3]

29.     Specifically, Fuchs was issued 118,609 LP units at $17.50 per share, totaling $2,075,657.50.

30.     Based upon the written and oral representations of Defendants, Fuchs understood the actual value of those LP Units to be between $20.00 per unit and $25.00 per unit, for a total value of between $2,372,180.00 and $2,965,225.00.

31.     Likewise, Heck was issued 31,416 LP units at a value of $17.50 per share, totaling $549,780.00.

32.     Based upon the written and oral representations of Defendants, Heck understood the actual value of those LP Units to be between $20.00 per unit and $25.00 per unit, for a total value of between $628,320.00 and $785,400.00.

33.     Only later did Plaintiffs learn Defendants had knowingly and materially misrepresented to them the value of the LP units.

---

[2] The valuation of the securities was critical to Plaintiffs' original valuation of their practice.

[3] A true and correct copy of the Subscription Agreement for LP Units is attached hereto as Exhibit A.

34.     Specifically, Defendants, through third-party Certent, issued a report on the equity valuation of the LP units—*i.e.,* the repricing Defendants had represented would be forthcoming at a significantly higher price than the $17.50 per unit price at which Plaintiffs had received their units.

35.     Per Certent's December 2021 report, the imputed value of each LP unit was not more than $17.50 per unit. Indeed, the value of the units was now only $13.22 per unit.

36.     Thus, the value of the securities issued to Plaintiffs as part of their transition was misrepresented by Defendants from anywhere between $4.28 per unit to $11.78 per unit. Put another way, Fuchs' 118,609 units were thus worth only $1,568,010.98—a far cry from the represented value of as much as $2,965,225.00.

37.     Likewise, Heck's 31,416 units were worth only $415,319.52, not the upwards of $785,400.00 that had been represented to him by Defendants.

38.     Upon information and belief, and also based upon Defendants' subsequent actions, it is now clear that Defendants misrepresentations respecting the value of their LP units is part and parcel of Steward's regular business practices.

39.     For example, despite Certent's December 2021 report, in March 2022, Steward yet again made written representations to their current and potential advisors that the LP units were worth $25.00 per unit. That representation was made, among other places, via a flyer sent to their current advisors, which sought to encourage them to recruit additional advisors using the $25.00 per LP unit valuation.[4]

40.     But following Steward's March 2022 representations (which were already know to be false based upon the December 2021 Certent Report), their continued misrepresentations

---

[4] *See* Wealth Manager Referral Program flyer, attached as Exhibit B.

regarding the value of the units were further highlighted by a second report issued by Caliper Advisors, Inc. to the Board of Directors of Steward on February 28, 2023 stating the "Fair Value of Equity Units in Steward Partners Holdings, LLC and Steward Partners Management Holdings, LLC as of December 31, 2022" was $11.22 per unit—not the $25.00 per unit represented by Steward to Financial Advisors such as Fuchs and Heck.[5]

41.     To be clear, the Valuation Letter makes clear the Report itself was not merely for internal consideration, but that "[t]he Steward Partners Board of Directors" used such reports "in conjunction with its determination of the fair market value of the SPMH membership units[.]"

42.     Thus, Steward has knowingly engaged in a pattern of misrepresenting to Fuchs, Heck, and others, the value of the LP units.

## C.     STEWARD CALLS BACK UNITS CONTRARY TO THEIR AGREEMENT

43.     In January 2022, Steward, apparently in a cash crunch, began squeezing acquired wealth management teams in order to raise cash and reduce compensation. Plaintiffs' team was of course caught in the cross hairs.[6]

44.     Specifically, Steward began complaining to Plaintiffs that their assets under management ("AUM") and production revenue was not sufficient to support the up-front deal Plaintiffs had entered with Defendants.

45.     Putting aside the fact that: (i) the up-front deal between Plaintiffs and Steward Advisory was meant to compensate each for their trailing production, not going forward revenue; and (ii) Plaintiffs were actually growing their AUM and producing large sums of revenue, Steward

---

[5] A true and correct copy of the Caliper Advisors March 24, 2023 "Non-Reliance Letter for Confidential Report Dated February 28, 2023" (the "Valuation Letter") is attached as Exhibit C.

[6] Upon information and belief, Steward's need for cash was caused by (i) its purchase of a broker-dealer, Umpqua, in early 2021, and (ii) the concomitant requirement to pay certain financial obligations to Raymond James, Steward's prior broker-dealer.

Advisory began demanding Plaintiffs return to them cash and, relevant here, a significant portion of the LP units previously issued to Plaintiffs.

46.     Specifically, in January 2022, Steward Advisory demanded Plaintiffs pay them $1.2 million dollars and return a significant portion of their LP Units or face the possibility of termination.

47.     Understandably, Plaintiffs balked at Steward Advisory's demands, particularly considering the terms of the LP units themselves were not tied to either AUM or production goals, and suggested instead that both parties simply adhere to the terms of the agreement they had reached in October 2020.

48.     In May 2022, the disagreement between Plaintiffs and Steward Advisory suddenly came to a head. Specifically, on May 18, 2022, Plaintiffs were summoned to a meeting where they were informed they were terminated from Steward Advisory—immediately.  Steward knew this would be devastating to both Plaintiffs and their clients and did not care.

49.     Fuchs and Heck, shocked by Steward's precipitous actions, immediately asked Steward what, if anything, could be done to reinstate employment. Plaintiffs had no choice but to make the request in order to protect and minimize risk to their clients—who relied upon Plaintiffs and their team to actively manage their money—as well as protect themselves from reputational risk.

50.     Ultimately, Steward Advisory blackmailed Plaintiffs—who had no choice but to act in their client's best interest—into paying to them $1,000,000 cash and returning nearly 2/3 of the LP units that had been issued to them, and whose terms were not subject to any condition other than a 7-year vesting period. This was a direct impact to Plaintiffs' income.

51.     Thus, Defendants had not only materially misrepresented the value of the LP units themselves but had also misrepresented to Plaintiffs the terms under which the LP units had been issued to them.

## V.
### CAUSE OF ACTION

### <u>COUNT I</u>

### VIOLATION OF SECTION 12(a)(2) of the Securities Act

52.     Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs above as if fully set forth herein.

53.     The Securities Act of 1933, Section 12(a)(2) provides strict liability if: (1) the seller of a security used interstate commerce or the mails, (2) to offer or to sell a security to the purchaser, (3) by means of a prospectus or oral communication, (4) that misstates or omits a material fact, (5) of which the purchaser did not have knowledge.

54.     A prospectus, as defined by the United States Supreme Court, is a "document soliciting the public to acquire securities." The interest sold to Plaintiffs involved the use of a prospectus, as that term is defined in the Securities Act of 1933.[7] Here, Plaintiffs received the same, or substantially same, offering materials/prospectus transmitted through interstate commerce and the mails.

55.     The Advisor Offer Summary constituted a prospectus within the meaning of Section 12 of the Securities Act.

56.     Defendants and their affiliates were sellers, offerors and/or solicitors of sales of the Notes issued in connection with the Offerings within the meaning of the Securities Act.

---

[7] The term "prospectus" means any prospectus, notice, circular, advertisement, letter, or communication, written or by radio or television, which offers any security for sale or confirms the sale of any security (with exceptions). 15 U.S.C. § 77b(a)(10).

57.     The Defendants and their affiliates used means and instrumentalities of interstate commerce and the United States mail.

58.     The Advisor Offer Summary contained untrue statements of material fact and omitted material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

59.     As alleged herein, the untrue statements of material fact and omissions of material fact concerned, among other things, the true value of the LP units.

60.     Plaintiffs purchased the LP units, not knowing of the untrue statements of material fact and omissions of fact in the Advisor Offer Summary alleged herein.

61.     By virtue of the conduct alleged herein, Defendant violated Section 12(a)(2) of the Securities Act, 15 U.S.C. § 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), and Plaintiffs have been damaged.

62.     Plaintiff has the right to rescind and recover the consideration paid for the LP Units, together with interest thereon, and elect to rescind and tender their securities to the Defendants.

63.     This claim is timely because it is brought within one year after the discovery of the untrue statements or omissions, or after such discovery should have been made by the exercise of reasonable diligence, and no more than three years has elapsed since Plaintiffs purchased or otherwise acquired the LP Units.

## VI.
### JURY DEMAND

64.     Plaintiffs demand a trial by jury.

## VII.
### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

a.   A judgment against Defendants;

b.   Damages in the amount of the financial losses incurred by Plaintiffs as a result of

Defendants' conduct and as a result of Defendants' violation of Section 12(2) of

the Securities Act of 1933; or alternatively

c.   Recessionary damages in favor of Plaintiffs as a result of Defendants violation of

Section 12(2) of the Securities Act of 1933; and

d.   For such other damages, relief and pre- and post-judgment interest as the Court may

deem just and proper.

Dated: September 28, 2023                     Respectfully submitted,

By:___*/s/ Robert E. Linkin*_____
Robert E. Linkin (State Bar No. 00795773)
Ursula Smith (State Bar No. 24120532)
**MUNCK WILSON MANDALA, LLP**
807 Las Cimas Pkwy
Building II, Suite 300
Austin, Texas 78746
(737) 201-1616 (telephone)
(737) 201-1601 (fax)
rlinkin@munckwilson.com
usmith@munckwilson.com

**ATTORNEYS FOR PLAINTIFFS**

# EXHIBIT A

## SUBSCRIPTION AGREEMENT - Rick Fuchs

The undersigned (the "Subscriber") hereby subscribes for **Partner Class** Units of Steward Partners Management Holdings, LLC, a Delaware limited liability company (the "Company"), on the terms and conditions set forth in this Subscription Agreement (this "Agreement") made as of the date set forth on the signature page hereof. Capitalized terms used but not otherwise defined herein have the respective meanings ascribed to them in the Operating Agreement.

### WITNESSETH:

WHEREAS, the Subscriber has entered into (i) a Raymond James Financial Services, Inc. ("RJFS") Independent Branch Owner Agreement, a Raymond James Financial Services, Inc. FA Agreement or similar agreement with RJFS pursuant to which the Subscriber will conduct certain securities activities as an independent contractor of RJFS, and (ii) an Employment Agreement with Steward Partners Global Advisory, LLC (the "Operating Affiliate") and James Gold and Hy Saporta ("Gold and Saporta"), pursuant to which the Operating Affiliate employs the Subscriber and Gold and Saporta serve as a office of supervisory jurisdiction for the Subscriber; and

WHEREAS, in connection with such Subscriber's employment relationship with the Operating Affiliate, the Company desires to grant and issue to the Subscriber and the Subscriber desires to accept 118,609 of the Company's **Partner Class** Units (the "Granted Units"), in accordance with the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the premises and the mutual representations and covenants hereinafter set forth, the parties hereto do hereby agree as follows:

## I.    REPRESENTATIONS BY SUBSCRIBER

The Subscriber hereby represents and warrants to the Company as follows:

1.1    The Subscriber has reviewed and understands the Company's Amended and Restated Limited Liability Company Agreement dated as of May 10, 2019 (the "Operating Agreement"), by and among the Company and the Members party thereto, has been given the opportunity to consult with legal and tax professionals and agrees to execute and deliver the joinder agreement attached as Exhibit A to the Operating Agreement (the "Joinder Agreement"), whereby the Subscriber submits to the terms and conditions of the Operating Agreement.

1.2    The Subscriber agrees and acknowledges that the Subscriber may never be able to liquidate his or her interest in the Company. In addition, Subscriber agrees and acknowledges that the Granted Units are subject to the terms and conditions of the Operating Agreement, including, among other things, (a) limitations on the ability to transfer the Granted Units, (b) that the Granted Units are non-voting Unit, and therefore, the Subscriber

will have little or no ability to affect the management or financing of the Company in the future, (c) that the Granted Units are subject to vesting and eligibility requirements and (d) that the Granted Units are subject to repurchase by the Company upon the occurrence of certain events, including termination of the Subscriber's employment with the Company or its Subsidiaries (including the Operating Affiliate).

1.3    The Subscriber is an "accredited investor" as such term is defined in Rule 501 of Regulation D ("Regulation D") promulgated under the Securities Act, as indicated by the Subscriber's responses to the questions contained in the accredited investor questionnaire attached hereto as Exhibit A (the "Accredited Investor Questionnaire").

1.4    The Subscriber has knowledge and experience in business and financial matters and prior investment experience, including investment in securities that are non-listed, unregistered and not traded on a national securities exchange nor on the Financial Industry Regulatory Authority ("FINRA") automated quotation system ("NASDAQ").

1.5    The Subscriber has been furnished by the Company with all information that the Subscriber has requested or desired to know, and has been afforded the opportunity to ask questions of and receive answers from duly authorized officers or other representatives of the Company concerning the Company and the terms and conditions of the Granted Units.

1.6    The Subscriber understands that the Granted Units have not been registered under the Securities Act of 1933, as amended (the "Securities Act") or under any state securities or "blue sky" laws and agrees not to sell, pledge, assign or otherwise transfer or dispose of the Granted Units unless they are registered under the Securities Act and under applicable state securities or "blue sky" laws or unless an exemption from such registration is available and the Subscriber has furnished to the Company an acceptable opinion of counsel that such exemption is available.

1.7    The Subscriber understands that the Granted Units are not currently traded or quoted on any market and that there is no market for the Partner Class Units. The Subscriber understands that even if a public market develops for the Granted Units, Rule 144 ("Rule 144") promulgated under the Securities Act restricts the transferability of the Granted Units.

1.8    The Subscriber consents to the placement of a legend on any certificate or other document evidencing the Granted Units to the effect that such Granted Units have not been registered under the Securities Act or any state securities or "blue sky" laws and setting forth or referring to the restrictions on transferability and sale thereof contained in this Agreement.    The Subscriber is aware that the Company shall make a notation in its appropriate records with respect to the restrictions on the transferability of the Granted Units. The legend to be placed on any such certificate, if any are issued, shall be in form substantially similar to the following:

"THE MEMBERSHIP UNITS REPRESENTED BY THIS CERTIFICATE ARE ISSUED, ACCEPTED AND HELD SUBJECT TO THE TERMS OF THE AMENDED AND

RESTATED LIMITED LIABILITY COMPANY AGREEMENT DATED AS OF MAY 10, 2019 BY AND BETWEEN THE COMPANY AND THE MEMBERS, FROM TIME TO TIME, PARTY THERETO, AND NEITHER THIS CERTIFICATE NOR THE MEMBERSHIP UNITS REPRESENTED HEREBY ARE SUBJECT TO SALE, ASSIGNMENT, TRANSFER, MORTGAGE, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION EXCEPT AS PROVIDED IN SUCH AGREEMENT AND SUBJECT TO SUCH AGREEMENT, TO ALL OF WHICH THE HOLDER HEREOF, BY ITS ACCEPTANCE HEREOF, AGREES. A COPY OF SUCH AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF ON RECEIPT OF WRITTEN REQUEST FOR THE SAME."

"THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER FEDERAL SECURITIES LAWS, INCLUDING BUT NOT LIMITED TO THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS, AND MAY NOT BE OFFERED FOR SALE, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR COMPLIANCE WITH THE TERMS OF AN APPLICABLE EXEMPTION FROM SUCH REGISTRATION AND THE FURNISHING TO THE COMPANY OF AN ACCEPTABLE OPINION OF COUNSEL (OR THE COMPANY'S SATISFACTION OTHERWISE) THAT SUCH EXEMPTION IS AVAILABLE."

1.9     The address of the Subscriber furnished by the Subscriber on the Accredited Investor Questionnaire is the Subscriber's principal residence.

1.10    The Subscriber has full power and authority (statutory and otherwise) to execute and deliver this Agreement and to accept the Granted Units. This Agreement constitutes the legally valid and binding obligation of the Subscriber, enforceable against the Subscriber in accordance with its terms.

1.11    The Subscriber acknowledges that if he or she is a Registered Representative of a FINRA member firm, he or she must give such firm the notice required by the FINRA's Rules of Fair Practice.

1.12    The Subscriber agrees that his or her representations and warranties herein and in Section 16.8 of the Operating Agreement (which are incorporated herein by reference) will survive the grant of Units hereunder and agrees to hold the Company and its directors, officers, employees, affiliates, controlling persons and agents and their respective heirs, representatives, successors and assigns harmless and to indemnify them against all liabilities, costs and expenses incurred by them as a result of (a) any sale or distribution of the Units by the Subscriber in violation of the Securities Act, any applicable state securities or "blue sky" laws, this Agreement or the Operating Agreement or (b) any false representation or warranty or any breach or failure by the Subscriber to comply with any covenant made by the Subscriber in this Agreement (including the Accredited Investor Questionnaire attached

hereto), the Operating Agreement or any other document furnished by the Subscriber to the Company.

## II.    CONDITIONS

2.1      The grant of Granted Units is subject to the Subscriber's prior execution and delivery of the Joinder Agreement and the Accredited Investor Questionnaire.

## III.    MISCELLANEOUS

3.1      Except as otherwise provided herein, this Agreement shall not be changed, modified or amended except by a writing signed by the Subscriber and the Company, and no provision of this Agreement may be waived except by a writing signed by the Company.

3.2      This Agreement is binding on the Subscriber and inures to the benefit of the Company and to its successors and assigns. This Agreement sets forth the entire agreement and understanding between the parties as to the subject matter hereof and merges and supersedes all prior discussions, agreements and understandings of any and every nature among them.

3.3      THE SUBSCRIBER EXPRESSLY AGREES THAT ALL THE TERMS AND PROVISIONS HEREOF SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAW. IN THE EVENT THAT A JUDICIAL PROCEEDING IS NECESSARY, THE SOLE FORUM FOR RESOLVING DISPUTES ARISING OUT OF OR RELATING TO THIS AGREEMENT ARE THE LOCAL OR THE FEDERAL COURTS LOCATED IN NEW YORK CITY, NEW YORK, AND ALL RELATED APPELLATE COURTS. THE PARTIES HEREBY IRREVOCABLY CONSENT TO THE JURISDICTION OF SUCH COURTS AND AGREE TO SAID VENUE. THE PARTIES WAIVE TO THE EXTENT PERMITTED UNDER APPLICABLE LAW THE RIGHT TO TRIAL BY JURY IN ANY SUCH PROCEEDING.

3.4      In order to discourage frivolous claims, the Subscriber agrees that unless a claimant in any proceeding arising out of this Agreement succeeds in establishing his, her or its claim and recovering a judgment against another party (regardless of whether such claimant succeeds against one of the other parties to the action), then the other party shall be entitled to recover from such claimant all of his, her or its reasonable legal fees and expenses relating to such proceeding and incurred in preparation therefor.

3.5      The holding of any provision of this Agreement to be invalid or unenforceable by a court of competent jurisdiction will not affect any other provision of this Agreement, which shall remain in full force and effect. If any provision of this Agreement shall be declared by a court of competent jurisdiction to be invalid, illegal or incapable of being enforced in whole or in part, such provision shall be interpreted so as to remain enforceable to the maximum extent permissible consistent with applicable law and the remaining conditions and provisions or portions thereof shall nevertheless remain in full force

DocuSign Envelope ID: 5A24E98A-0FDD-4C16-B4B5-508D5C76E55E

and effect and be enforceable to the extent they are valid, legal and enforceable, and no provision shall be deemed dependent on any other covenant or provision unless so expressed herein.

      3.6     It is agreed that a waiver by the Company of a breach of any provision of this Agreement shall not operate, or be construed, as a waiver of any subsequent breach by that same party.

      3.7     The Subscriber agrees to execute and deliver all such further documents, agreements and instruments and take such other and further action as may be necessary or appropriate to carry out the purposes and intent of this Agreement.

      3.8     Nothing in this Agreement creates or shall be deemed to create any rights in any person or entity other than the Company.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, each of the undersigned has executed this Agreement as of October 2, 2020.

X _____

Rick Fuchs


Steward Partners Management Holdings, LLC


By: _____

Name:  Hy Saporta

Title: Chief Operating Officer


[Subscription Agreement Signature Page]

**EXHIBIT A**

## ACCREDITED INVESTOR QUESTIONNAIRE

The Subscriber represents and warrants that he or she comes within one category marked below, and that for any category marked, he or she has truthfully set forth, where applicable, the factual basis or reason the Subscriber comes within that category. ALL INFORMATION IN RESPONSE TO THIS SECTION SHALL BE KEPT STRICTLY CONFIDENTIAL. The undersigned agrees to furnish any additional information which the Company deems necessary in order to verify the answers set forth below.

Category
A ___x___

The undersigned is an individual whose net worth, or joint net worth with his or her spouse, presently exceeds $1,000,000.

*Explanation: In calculating net worth (i.e., excess of total assets over total liabilities), you may include equity in personal property and real estate (excluding your primary residence), cash, short-term investments, stock and securities. Equity in personal property and real estate should be based on the fair market value of such property less debt secured by such property. For the purpose of calculating total liabilities, indebtedness secured by your primary residence, up to the estimated fair market value of the residence, shall not be included as a liability, and indebtedness exceeding the fair market value of your residence shall be included as a liability.*

Category
B ___x___

The undersigned is an individual who had an income in excess of $200,000 in each of the two most recent years, or joint income with his or her spouse in excess of $300,000 in each of those years (in each case including foreign income, tax exempt income and full amount of capital gains and losses but excluding any income of other family members and any unrealized capital appreciation) and has a reasonable expectation of reaching the same income level in the current year.

Category
C ___

The undersigned is a director or executive officer of the Company.

x _____

Rick Fuchs
16150 Fitzhugh Road
Dripping Springs, TX 78620

Subscriber Tax ID or SSN: ▮▮▮▮▮▮

Date: 10/13/20

DocuSign Envelope ID: 5A24E98A-0FDD-4C16-B4B5-50805C76E55E

**EXHIBIT B**

## JOINDER AGREEMENT

Reference is made to that certain Amended and Restated Limited Liability Company Agreement of Steward Partners Management Holdings, LLC (the "Company") dated as of May 10, 2019 (the "Operating Agreement") by and among the Company and the Members thereof. The undersigned hereby represents, warrants and acknowledges to the Company that the undersigned (i) has been given a copy of the Operating Agreement, (ii) has been given ample opportunity to read the Operating Agreement, to consult with lawyers, accountants and other professionals regarding that document and to ask questions of the management of the Company regarding the Operating Agreement and (iii) has read the Operating Agreement and fully understands it.

Having reviewed the Operating Agreement and subscribed for Partner Class Units, the undersigned hereby agrees to be bound by all of the terms, conditions and obligations set forth in the Operating Agreement as a Partner Class Member of the Company.

Dated as of October 2, 2020.

x _____
Rick Fuchs

Address for Notices:

16150 Fitzhugh Road
Dripping Springs, TX 78620

# ELECTION UNDER SECTION 83(b) OF THE INTERNAL REVENUE CODE OF 1986

The undersigned taxpayer hereby elects, pursuant to Section 83(b) of the Internal Revenue Code of 1986, as amended ("Code"), to include in the taxpayer's gross income for the current taxable year as compensation for services the excess (if any) of the fair market value of the property described below over the amount paid for such property.

     1.     The name, address, taxpayer identification number and taxable year of the undersigned are as follows:

Taxpayer Name: Rick Fuchs

Address:_ 16150 Fitzhugh Road  Dripping Springs, TX 78620

Social Security Number: ▮▮▮▮▮▮▮

Tax Year: 2020

_59,305_

     2.     The property which is the subject of this election is ~~118,609~~ Partner Class Units (the "Units") in Steward Partners Management Holdings, LLC, a Delaware limited liability company (the "Company"), and 118,609 Partner Class Units in Steward Partners Holdings, LLC, a Delaware limited liability company (the "Mirror Units").

     3.     The date on which the property was transferred: October 2, 2020

     4.     The nature of the restrictions to which the property is subject: The Taxpayer may not sell, assign, mortgage, hypothecate or encumber all or any portion of the Units except in accordance with the applicable provisions of the Amended and Restated Limited Liability Company Agreement of the Company, as amended. Units are subject to vesting and unvested Units are forfeited if the Taxpayer ceases to be an employee, consultant or other service provider to the Company or certain of its affiliates. The Company has certain repurchase rights with respect to the Units if the Taxpayer ceases to be an employee, consultant or other service provider to the Company or certain of its affiliates. Similar restrictions apply to the Mirror Units.

     5.     The fair market value at the time of transfer, determined without regard to any restriction other than a restriction which by its terms will never lapse, of such property is (i) **$3.83** per Unit, and (ii) **$3.83** per Mirror Unit.

     6.     The amount (if any) paid for such property:

     7.     (i) **$0** per Unit and (ii) **$0** per Mirror Unit.

     8.     The amount to include in gross income: $ ~~454,272.47~~.

_$227,138.15_

DocuSign Envelope ID: 5A24E98A-0FDD-4C16-B4B5-508D5C76E55E

The undersigned taxpayer will file this election with the Internal Revenue Service office with which taxpayer files his or her annual income tax return not later than 30 days after the date of transfer of the property. The undersigned has submitted a copy of this statement to the person for whom the services were performed in connection with the undersigned's receipt of the above-described property. The undersigned is the person performing the services in connection with the transfer of said property.

The undersigned understands that the foregoing election may not be revoked except with the consent of the Commissioner.

Date: _10/13/20_

Name: Rick Fuchs

# Loan Amortization Schedule

| PW Person ID | Branch Number AHK00 | Loan ID | Loan Type TA Loan |
|---|---|---|---|

| Loan Amount $928,261.00 | Interest Rate .38% | Number of Payments 36 | Loan Repayment Frequency QUARTERLY |
|---|---|---|---|

Loan Repayment Term
9 YEARS

## Payment Schedule

| # | Payment Date | Opening Balance | Payment Amount | Principal Amount | Interest Amount | Closing Balance |
|---|---|---|---|---|---|---|
| 1 | Jul 15, 2021 | $928,261.00 | $26,240.71 | $25,358.86 | $881.85 | $902,902.14 |
| 2 | Oct 15, 2021 | $902,902.14 | $26,240.71 | $25,382.95 | $857.76 | $877,519.19 |
| 3 | Jan 15, 2022 | $877,519.19 | $26,240.71 | $25,407.07 | $833.64 | $852,112.12 |
| 4 | Apr 15, 2022 | $852,112.12 | $26,240.71 | $25,431.20 | $809.51 | $826,680.92 |
| 5 | Jul 15, 2022 | $826,680.92 | $26,240.71 | $25,455.36 | $785.35 | $801,225.56 |
| 6 | Oct 15, 2022 | $801,225.56 | $26,240.71 | $25,479.55 | $761.16 | $775,746.01 |
| 7 | Jan 15, 2023 | $775,746.01 | $26,240.71 | $25,503.75 | $736.96 | $750,242.26 |
| 8 | Apr 15, 2023 | $750,242.26 | $26,240.71 | $25,527.98 | $712.73 | $724,714.28 |
| 9 | Jul 15, 2023 | $724,714.28 | $26,240.71 | $25,552.23 | $688.48 | $699,162.05 |
| 10 | Oct 15, 2023 | $699,162.05 | $26,240.71 | $25,576.51 | $664.20 | $673,585.54 |
| 11 | Jan 15, 2024 | $673,585.54 | $26,240.71 | $25,600.80 | $639.91 | $647,984.74 |
| 12 | Apr 15, 2024 | $647,984.74 | $26,240.71 | $25,625.12 | $615.59 | $622,359.62 |
| 13 | Jul 15, 2024 | $622,359.62 | $26,240.71 | $25,649.47 | $591.24 | $596,710.15 |
| 14 | Oct 15, 2024 | $596,710.15 | $26,240.71 | $25,673.84 | $566.87 | $571,036.31 |
| 15 | Jan 15, 2025 | $571,036.31 | $26,240.71 | $25,698.23 | $542.48 | $545,338.08 |
| 16 | Apr 15, 2025 | $545,338.08 | $26,240.71 | $25,722.64 | $518.07 | $519,615.44 |
| 17 | Jul 15, 2025 | $519,615.44 | $26,240.71 | $25,747.08 | $493.63 | $493,868.36 |
| 18 | Oct 15, 2025 | $493,868.36 | $26,240.71 | $25,771.54 | $469.17 | $468,096.82 |
| 19 | Jan 15, 2026 | $468,096.82 | $26,240.71 | $25,796.02 | $444.69 | $442,300.80 |
| 20 | Apr 15, 2026 | $442,300.80 | $26,240.71 | $25,820.52 | $420.19 | $416,480.28 |
| 21 | Jul 15, 2026 | $416,480.28 | $26,240.71 | $25,845.05 | $395.66 | $390,635.23 |
| 22 | Oct 15, 2026 | $390,635.23 | $26,240.71 | $25,869.61 | $371.10 | $364,765.62 |
| 23 | Jan 15, 2027 | $364,765.62 | $26,240.71 | $25,894.18 | $346.53 | $338,871.44 |
| 24 | Apr 15, 2027 | $338,871.44 | $26,240.71 | $25,918.78 | $321.93 | $312,952.66 |
| 25 | Jul 15, 2027 | $312,952.66 | $26,240.71 | $25,943.40 | $297.31 | $287,009.26 |
| 26 | Oct 15, 2027 | $287,009.26 | $26,240.71 | $25,968.05 | $272.66 | $261,041.21 |
| 27 | Jan 15, 2028 | $261,041.21 | $26,240.71 | $25,992.72 | $247.99 | $235,048.49 |
| 28 | Apr 15, 2028 | $235,048.49 | $26,240.71 | $26,017.41 | $223.30 | $209,031.08 |
| 29 | Jul 15, 2028 | $209,031.08 | $26,240.71 | $26,042.13 | $198.58 | $182,988.95 |
| 30 | Oct 15, 2028 | $182,988.95 | $26,240.71 | $26,066.87 | $173.84 | $156,922.08 |
| 31 | Jan 15, 2029 | $156,922.08 | $26,240.71 | $26,091.63 | $149.08 | $130,830.45 |
| 32 | Apr 15, 2029 | $130,830.45 | $26,240.71 | $26,116.42 | $124.29 | $104,714.03 |
| 33 | Jul 15, 2029 | $104,714.03 | $26,240.71 | $26,141.23 | $99.48 | $78,572.80 |
| 34 | Oct 15, 2029 | $78,572.80 | $26,240.71 | $26,166.07 | $74.64 | $52,406.73 |
| 35 | Jan 15, 2030 | $52,406.73 | $26,240.71 | $26,190.92 | $49.79 | $26,215.81 |
| 36 | Apr 15, 2030 | $26,215.81 | $26,240.72 | $26,215.81 | $24.91 | $0.00 |
| | | | $944,665.57 | $928,261.00 | $16,404.57 | |

# EXHIBIT B


STEWARD PARTNERS
GLOBAL ADVISORY

# WEALTH MANAGER REFERRAL PROGRAM

Steward Partners continues to attract and retain the highest caliber Financial Advisors and their teams.  As our Firm grows, we want to ensure our existing Partners can help support this track record of onboarding best in class Financial Advisors and teams and secure our ongoing success by sharing qualified Financial Advisor referrals.

A referral that leads to a successful hire may result in both a cash and equity unit award from the Firm.

To be eligible for a referral award from the Firm under the Wealth Manager Referral Program ("Program"), when referring a potential partner, it must be a "warm lead". Specifically, a warm lead shall include, at the very least, the following attributes:

- the referring Partner has made contact with the referred advisor(s) and shared the Firm's story;
- the referred advisor(s) has affirmed he/she is ready for additional discussions regarding joining the Firm; and
- the referring Partner sets up an introduction with the relevant internal contact i.e., Divisional President.

## Referral Awards

Following a warm lead that results in the successful hiring of a new advisor (or team) under the Program, Partners may be eligible for an award of both Steward Partners Management Holdings ("SPMH") equity and cash ("Referral Awards"), based on the new advisor or team's hiring T-12 ("HGR") at the time of hire, as determined by the Firm in its sole discretion.

The equity and cash awards may be awarded by the Firm, in its discretion, based on the following guidelines:

| HGR | Equity Units | Cash Award |
|---|---|---|
| $0 - $4,000,000 | Up to 5% of the HGR | Up to 3% of the HGR |
| $4,000,001 + | Up to 5% of the HGR | Up to 4% of the HGR |

To illustrate one potential scenario of the Referral Awards based on a HGR of $1,200,000 and the then current recruiting valuation of SPMH equity of $25.00 per unit:

- The equity award may be 2,400 units (i.e., $60,000 @ $25 per unit).
- The cash award may be $36,000

To illustrate another potential scenario of the Referral Awards based on a HGR of $4,100,000 and the then current recruiting valuation of SPMH equity of $25.00 per unit:

- The equity award may be 8,200 units (i.e., $205,000 @ $25 per unit).
- The cash award may be $164,000



## Additional Information

- Referral Awards will only trigger eligibility, if at all, if the advisor(s) joins within 18 months of the initial referral date.
- Eligibility for this Program is for advisor referrals only and excludes referrals for other staff or management positions along with interns.
- Referral Awards may be shared between Partners, as determined by the Firm in its sole discretion.
- The determination of a "warm lead" is subject to the sole and absolute discretion of the Firm.
- **SPGA Employees only:** Any cash paid under this Program is considered income and subject to applicable withholdings and deductions.
- The number of units is determined using a forward-looking recruiting valuation which is subject to change.  The current recruiting valuation is determined by the Firm in its sole and absolute discretion.
- Any unit award would be subject to the terms and conditions of a subscription agreement, or similar agreement, and the terms and conditions of the Second Amended and Restated Limited Liability Agreement for Steward Partners Management Holdings, as amended, and as the same may be modified, amended and restated from time to time.
- This program is not intended to encourage or induce the Firm's employees or prospective employees to violate or interfere with any contractual or other restriction that may exist with any prior employer.
- Eligible Partners will receive the Referral Awards in the month following the referred advisor (or team)'s start date with the Firm, provided that the referring Partner(s) and the referred advisor/team are still employed and have not given notice of termination before the referral fee is paid.
- The Firm determines eligibility for such referral awards in its sole and absolute discretion.

## Eligibility

All Partners are eligible to receive a referral bonus and equity unit award except referrals by:
- Divisional Presidents; or
- Senior Management team members.

## Process To Submit a Wealth Manager Referral

To submit a referral, please complete the Firm's Wealth Manager Referral Form (located on the Intranet) and send it to the relevant Divisional President for review and approval.

For additional information, please contact the relevant Divisional President.

# EXHIBIT C



Caliber Advisors, Inc.
420 Stevens Ave, Suite 270
Solana Beach, CA 92075

858.792.8990 Tel
858.792.8988 Fax

www.caliberadvisors.com

March 24, 2023

Board of Directors
Steward Partners Management Holdings, LLC
Steward Partners Holdings, LLC
140 E. 45th Street, 36th Floor
New York, NY 10017

Re: Non-Reliance Letter for Confidential Report Dated February 28, 2023

Dear Members of the Board:

Caliber Advisors Inc. ("Caliber Advisors") was engaged by Steward Partner Management Holdings, LLC ("SPMH") and Steward Partners Holdings, LLC ("SPH" and, together with SPMH and their affiliates, "Steward Partners") to determine the fair value of the equity interests in SPMH and SPH, as of December 31, 2022, on a privately-held, minority-interest basis in accordance with FASB ASC 718 and FASB ASC 820.

Caliber prepared a confidential report, "Fair Value of Equity Units in Steward Partners Holdings, LLC and Steward Partners Management Holdings, LLC, as of December 31, 2022, in Accordance with FASB ASC 718 and FASB ASC 820" dated February 28, 2023 (the "Report"). The Report was prepared for financial and tax reporting purposes related to the issuance of membership units and profits interests of SPMH and SPH. No other use is intended or should be inferred.

The Steward Partners Board of Directors (the "Board") intends to use the Report in conjunction with its determination of the fair market value of SPMH membership units and profits interests for purposes of granting such membership units and profits interests to certain directors, employees and independent contractors of Steward Partners. The Report states that the fair value of the SPMH membership units is $11.22 per unit and a "strike price" of $444,900,000 for profits interests as of December 31, 2022 (the "Valuation Results").

Steward Partners has elected to share the Valuation Results with certain employees and independent contractors who hold units and/or profits interests (each, a "Recipient"). No right to rely upon the Valuation Results is granted to any Recipient. Caliber Advisors shall have no liability to any Recipient whatsoever. Caliber Advisors will not provide a copy of the Report to any person other than the Board, and the Board has determined to share the Valuation Results with its members and potential members but not to share the Report with any persons other than the third-party investors and certain officers of Steward Partners.

In connection with being provided with the Valuation Results, each Recipient will be deemed to agree and acknowledge with Steward Partners and Caliber Advisors as follows:

- The Report was prepared solely for SPMH and SPH and not any Recipient and is limited to matters that SPMH and SPH requested Caliber Advisors to review. Any Recipient and any other party may have different objectives or priorities and the Recipient should not expect that the Report will cover all issues that may be relevant to the Recipient.

- The Report is subject to many limitations, restrictions and caveats and does not provide any assurance as to the accuracy, comprehensiveness or currency of the information contained therein.

Board of Directors
Steward Partners Management Holdings, LLC
Steward Partners Holdings, LLC
March 24, 2023
Page 2

Caliber Advisors has not made and is not making any representations or warranties whatsoever regarding the subject matter of the Report, express or implied, and Recipients are not relying and have not relied on any representation or warranty whatsoever regarding the subject matter of the Report.

- The Report is for reference and background purposes only and, as such, Recipients are not entitled to rely on and will not make a claim of reliance on the Report in connection with any decision to pursue action or for any other purpose.

- The Valuation Results are being provided to Recipients for informational purposes only. It is understood and agreed that the receipt of the Valuation Results does not substitute for Recipient's own due diligence. Recipients recognize and agree that Caliber Advisors makes no representation or warranty as to the accuracy, completeness or sufficiency of the Report or its fitness for any particular use.

- The Report speaks only for the matters and information available to Caliber Advisors as of and on the date of the Report. Caliber Advisors does not accept any responsibility for events and circumstances occurring after the date of the Report. Caliber Advisors does not have any responsibility to update the Report. Issues or information may have arisen from events or changes that may have occurred after the preparation of the Report. There is no obligation to update or further investigate the Report including in changes in law, fact, or any other development relevant to the Report or Steward Partners.

- The Recipient agrees that neither Caliber Advisors, nor any direct or indirect holder of any equity securities of Caliber Advisors nor any director, officer, employee, representative or agent of Caliber Advisors shall have any liability or obligation of any nature whatsoever in connection with or related to the Report including without limitation any claim based upon the alleged inaccuracy or incompleteness of the Valuation Results and/or related materials provided to the Recipient and the Recipient waives and releases all claims, causes of action, liabilities or obligations of any sort or kind that Recipient had or may now or hereafter have arising out of or relating the Report or Recipient's review, use or dissemination thereof.

- Recipients agree that they will not bring any actions, proceedings or claims against Caliber Advisors to the extent the action, proceedings or claim in any way relates to or concerns or relates to the Report.

In addition, each Recipient agrees that the Valuation Results are confidential. As such, each Recipient agrees that the Valuation Results may only be disclosed as expressly set forth below:

- Each Recipient may disclose the Valuation Results to its legal, accounting, tax, financial and other professional advisers (collectively, "Advisers") provided that such Advisers are members of a regulated profession and are bound by mandatory external professional rules of governing the confidentiality and use of materials that they receive while acting in their professional capacity. In addition, prior to providing such Adviser with the Valuation Results, each Recipient must inform them that the Valuation Results is only to be used to support or advise such Recipient that Caliber Advisors accepts no liability or duty to them and that the Valuation Results must be treated as confidential.

Board of Directors
Steward Partners Management Holdings, LLC
Steward Partners Holdings, LLC
March 24, 2023
Page 3

- Each Recipient agrees that it will not refer to the Valuation Results without Steward Partners' prior written consent except if disclosure is required by law, regulation, or court order or is required by a competent regulatory, governmental, judicial or supervisory authority with whose requirements such Recipient is bound to comply (in which case, such Recipient shall, unless prohibited by law or regulation, inform Steward Partners in advance unless such Recipient is not legally permissible to do so in which case such Recipient shall inform Steward Partners promptly thereafter).

This letter sets out the entire terms and conditions regarding the disclosure of the Valuation Results with any Recipient as determined by Steward Partners and Caliber Advisors and supersedes any other prior written or oral representations between the parties related to the subject matter hereof.  The invalidity or unenforceability of any provision of this letter shall not affect the validity or enforceability of any other provision.

This letter will be governed by, and construed in accordance with, the laws of the State of California, without giving effect to conflicts of law provisions.

Respectfully,

Jimmy Mar, CFA, ASA
Vice President

cc:  Joseph Faber, Chief Financial Officer